```
MONIQUE C. WINKLER (Cal. Bar No. 213031)
JASON H. LEE (Cal. Bar No. 253140)
MARC KATZ (Cal. Bar No. 189534)
  katzm@sec.gov
MATTHEW MEYERHOFER (Cal. Bar No. 268559)
  meyerhoferm@sec.gov

Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
44 Montgomery Street, Suite 2800
San Francisco, CA 94104
(415) 705-2500 (Telephone)
(415) 705-2501 (Facsimile)
```

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>  Plaintiff,<br><br>  vs.<br><br>ABRAHAM SHAFI,<br><br>  Defendant,<br><br>  and<br><br>BARBARA WOORTMANN,<br><br>  Relief Defendant. | Case No.<br><br>COMPLAINT |

Plaintiff Securities and Exchange Commission (the "SEC") alleges:

## SUMMARY OF THE ACTION

1. From at least March through June of 2021, Abraham Shafi ("Shafi") engaged in a fraudulent scheme to mislead investors and sell about $170 million of preferred stock in Get Together, Inc. (more commonly known as "IRL"), a social media platform that he co-founded and then led as its Chief Executive Officer until April 2023.

2. Shafi described IRL as an app that had attracted 12 million purported users and achieved a high rank in the Apple App Store based on viral popularity and organic growth. This description misleadingly omitted the significant role that advertising played in Shafi's growth

strategy for IRL. Since the fall of 2019, Shafi had promoted IRL and boosted its perceived popularity by spending millions of dollars on "incent" advertisements—advertisements that offered users incentives to download the app.

3. Moreover, Shafi did not simply fail to disclose IRL's use of incent advertisements. He also made false statements about IRL's advertising expenditures, providing prospective investors with offering materials that significantly understated the amount of money that IRL had spent on marketing-related expenses. Shafi also routed payments to IRL's largest incent advertising platform through third parties, in an apparent effort to conceal the true nature of those payments.

4. Shafi's deception had another dimension as well. He hid from investors that, prior to the 2021 offering, he and his then-fiancée, Barbara Woortmann ("Woortmann"), who was never employed by IRL, had charged at least hundreds of thousands of dollars in personal expenses to IRL business credit cards they possessed. These charges covered items such as clothing, home furnishings, travel, and everyday living expenses. Shafi used IRL's bank account to pay the monthly balances on these credit cards.

5. Investors, unaware that IRL had spent millions of dollars on incent advertisements and ignorant of Shafi and Woortmann's misuse of IRL's credit cards, purchased a total of about $170 million in IRL preferred stock in connection with IRL's "Series C" private offering. The lead investor, "VC1," a venture capital fund, purchased about $125 million worth of IRL securities from IRL and about $7.5 million worth of IRL securities directly from Shafi. Another venture capital fund, "VC2," purchased about $10 million worth of IRL securities from IRL.

6. After the Series C offering closed, Shafi continued to deceive investors, whose representatives held seats on IRL's Board of Directors. He orchestrated a scheme to continue hiding IRL's large advertising expenditures—including its expenditures on incent ads—by directing one of IRL's vendors to submit invoices that underreported IRL's advertising-related costs. Shafi and Woortmann also continued charging what ultimately amounted to millions of dollars in personal expenses to IRL's business credit cards. Among other things, Shafi used his

IRL credit card to pay for hundreds of thousands of dollars of expenses related to his April 2022 wedding to Woortmann, including wedding guests' airfare and luxury hotel accommodations.

7. A Special Committee of IRL's Board of Directors removed Shafi as IRL's CEO in late April 2023, after discovering Shafi and Woortmann's practice of charging personal expenses to their IRL business credit cards. Shortly afterwards, IRL's reported user population collapsed. A forensic analysis undertaken at the direction of the Special Committee determined that, prior to the collapse, a substantial percentage of IRL's users were likely bots. IRL's Board of Directors subsequently decided to wind down the company.

8. Shafi violated the antifraud provisions of the federal securities laws. Specifically, Shafi violated Section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)] and Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5]. Woortmann was unjustly enriched by Shafi's violations.

**JURISDICTION AND VENUE**

9. The SEC brings this action pursuant to Sections 20(b), 20(d), and 22(a) of the Securities Act [15 U.S.C. §§ 77t(b), 77t(d), and 77v(a)], and Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), and 78aa].

10. This Court has jurisdiction over this action pursuant to Sections 20(b), 20(d)(1), and 22(a) of the Securities Act [15 U.S.C. §§ 77t(b), 77t(d)(1), and 77v(a)], and Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), and 78aa].

11. Shafi, directly or indirectly, made use of the means and instrumentalities of interstate commerce or of the mails in connection with the acts, transactions, practices, and courses of business alleged in this complaint.

12. Venue is proper in this District pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)], and Section 27(a) of the Exchange Act [15 U.S.C. § 78aa(a)]. Acts, transactions, practices, and courses of business that form the basis for the violations alleged in this complaint occurred in this District. For example, IRL's principal place of business during all relevant times was located in Berkeley, CA.

13. Under Civil Local Rule 3-2(d), this civil action should be assigned to the Oakland Division because a substantial part of the events or omissions which give rise to the claims alleged herein occurred in Alameda County.

## DEFENDANT AND RELIEF DEFENDANT

14. Defendant **Abraham Shafi**, age 37, resides in Pepeekeo, Hawaii. He co-founded IRL and was its CEO until April 2023.

15. Relief Defendant **Barbara Woortmann**, age 35, resides in Pepeekeo, Hawaii. She is Shafi's wife.

## RELATED ENTITY

16. **Get Together, Inc.** is a Delaware corporation. During the period relevant to this action, its principal place of business was in Berkeley, CA.

## FACTUAL ALLEGATIONS

A. **Shafi Used "Incent" Advertisements to Attract IRL Downloads and Users.**

17. Shafi and his co-founders created the IRL social media app in 2018. They launched IRL with the intention of building a social media platform centered on events that people would attend together, initially "in real life" and later remotely as well.

18. In September 2019, Shafi began promoting IRL using "incent" advertisements. An incent advertisement is an ad that offers users a reward that is unrelated to the app itself in exchange for downloading the advertised app. For example, someone playing a game on their phone or computer might be offered extra "lives" or "gems" to use in the game in exchange for downloading a second app that is unrelated to the game. Or a potential user might be offered "points," which could be redeemed for gift cards, in exchange for downloading an app.

19. Incent ads are attractive to some app developers because they can be used to drive a large volume of downloads, quickly, at low cost. Traditional online advertising can cost an app developer as much as $5 to $7 per download, whereas incent ads can generate downloads at a cost of less than $1 each. But because users who download an app via an incent ad are incentivized by a reward unrelated to the app, they are less likely to turn into long-term users.

20. In September 2019, Shafi began using incent advertising platforms to promote IRL. He told representatives of these platforms that his goal was to drive large download volumes and thereby achieve a high rank in the Apple App Store.

21. Between September 2019 and April 2021, Shafi caused IRL to spend about $5.7 million on incent advertisements. This spending had the desired effect: IRL became an app that regularly ranked in the top 20, and sometimes in the top 10, of social media apps in the Apple App Store.

**B.  Shafi Routed IRL's Payments To Its Principal Incent Advertising Platform Through Intermediaries.**

22. Soon after IRL started using incent advertisements, Shafi asked one of his acquaintances, "Individual 1," to handle IRL's payments to IRL's principal incent advertising platform (the "Incent Ad Platform"). Every two weeks, the Incent Ad Platform would send an invoice for IRL's incent advertisements to Individual 1. Individual 1 would then ask Shafi to send him enough money to pay the invoice, and IRL would transfer money to pay the invoice to an entity controlled by Individual 1. That entity would then pay the Incent Ad Platform on IRL's behalf.

23. In October 2020, Shafi hired a business entity (the "Agency") owned and managed by another one of his acquaintances, "Individual 2," to assist with IRL's marketing and advertising efforts. The Agency then took over the payment-intermediary role from Individual 1, following the same general procedure to pay the Incent Ad Platform's invoices for IRL.

**C.  Shafi and Woortmann Used IRL Credit Cards and Bank Accounts To Pay For Personal Expenses.**

24. In 2017, Shafi obtained a business credit card account for "GATHERAPP INC.", a predecessor business to IRL. No later than January 2019, Shafi had obtained a second credit card on the same account for Woortmann. Around the beginning of 2020, the business associated with the account formally changed from GATHERAPP INC. to Get Together, Inc. Woortmann was never an employee or contractor of IRL.

25. Beginning no later than January 2019 and continuing until at least September 2022, Shafi and Woortmann used these credit cards to pay for millions of dollars in personal expenses. These expenses included: purchases from home improvement and home furnishing retailers; purchases from clothing and jewelry retailers; airfare; stays at luxury hotels in Hawaii and elsewhere; everyday expenses from restaurants, grocery stores, food delivery apps, and rideshare apps; and PayPal and Venmo payments that appear to be of a personal nature, including payments to Woortmann's family and friends.

26. From at least January 2019 until September 2022, Shafi typically paid the monthly bills on the IRL business credit cards, which included these millions of dollars in personal expenses, using funds from IRL's bank account. During that three-and-a-half-year period, it appears that Shafi made only one payment against the IRL business credit card account balance using funds from his own personal bank account: a $150,000 payment in April 2021.

**D. Shafi and IRL Sold About $170 Million Worth of IRL Securities While Concealing IRL's Reliance On Incent Advertisements And Shafi and Woortmann's Use of IRL's Credit Card Account To Pay For Personal Expenses.**

27. From at least March through June of 2021, IRL solicited VC1, VC2, and other entities for investments in IRL. As IRL's CEO, Shafi had ultimate authority over the offering documents that he shared with prospective investors.

28. During the offering process, Shafi presented IRL as an app that had achieved impressive growth organically—meaning from users who did not sign up via a paid advertisement—and thereby achieved a high rank in the Apple App Store. He misleadingly omitted any reference to incent ads from the materials he shared with investors. He also provided investors with documents that significantly underreported IRL's advertising expenses.

29. For example, Shafi provided prospective investors with a "Spend Summary" that purported to break down IRL's operating expenses into several categories on a month-by-month basis from January 2020 to February 2021. This document reported that IRL's total PR/marketing expenses averaged out to less than $40,000 per month. In reality, from January 2020 to February 2021, IRL spent, on average, more than $200,000 per month on the Incent Ad Platform alone. In

March and April 2021, IRL's spending on the Incent Ad Platform increased to about $500,000 per month.

30. During a March 16, 2021 text message conversation between Shafi and the Managing Partner of VC2, Shafi sent the Managing Partner text messages with excerpts from the "Spend Summary." The Managing Partner remarked that another prospective investor would "love" that IRL "spent virtually zero on marketing." Shafi misleadingly replied, "That's us! Real social."

31. On April 19, 2021, Shafi sent VC1 a question-and-answer ("Q&A") document claiming that IRL spent about $50,000 per month on advertising. The same document misleadingly attributed IRL's high rank in the Apple App Store to "organic channels," without mentioning IRL's use of incent advertisements. Shafi reviewed the Q&A document before he sent it to VC1. Shafi shared the Q&A document with other investors as well.

32. Shafi knew, or was reckless in not knowing, that IRL's true advertising expenditures were much higher than $50,000 per month. Shafi was aware of the true magnitude of IRL's expenditures on the Incent Ad Platform from his communications with Individual 1 and from his communications with a representative of that platform. For example, during a December 1, 2020 chat discussion with a representative of the Incent Ad Platform, Shafi wrote, "I spend millions with you. I expect some basic treatment." In an April 9, 2021 chat discussion, the same representative informed Shafi that IRL's spending on incent advertisements had increased to between $15,000 and $17,000 *per day*.

33. On April 13, 2021, Shafi sent VC1 a slide presentation. Shafi included information in this slide presentation touting that IRL was highly ranked in the Apple App Store. But again, the presentation made no mention of the fact that IRL had used incent advertising to achieve this rank. Shafi reviewed the slide presentation before sending it to VC1. Shafi shared the slide presentation with other investors as well.

34. Additionally, on or around April 21, 2021, Shafi sent emails to VC1 and other investors attributing a surge in downloads of the IRL app that had occurred in the fall of 2019 to "seasonality around the holidays." As Shafi knew, or was reckless in not knowing, these emails

were misleading because they omitted that the surge occurred around the same time IRL started spending heavily on incent advertising.

35. IRL investors considered these false and misleading statements to be important to their decisions to invest in IRL. Investors viewed IRL's high app store rank as evidence of the app's popularity and success in acquiring customers. Investors considered the amount of money IRL spent on marketing and advertising to be important because, for example, the false lower figures presented to investors by Shafi suggested that the app was growing efficiently and could eventually become profitable. VC1 considered information about IRL's user acquisition channels to be important because such information was relevant to understanding IRL's popularity as well as its cost structure.

36. On April 23, 2021, shortly before VC1 provided Shafi with a term sheet outlining a potential investment deal, Shafi told a representative of VC1 that IRL had received multiple term sheets from other prospective investors valuing IRL at $1 billion. As Shafi knew, or was reckless in not knowing, this was false. At that time, IRL had received only one tentative term sheet from a prospective investor, and that investor had withdrawn the term sheet a month earlier, on March 23, just one day after sending it.

37. On May 18, 2021, VC1, VC2, and other investors entered into a Preferred Stock Purchase Agreement ("PSPA") with IRL. Shafi signed the PSPA on behalf of IRL.

38. In the PSPA, Shafi and IRL represented that IRL would use the proceeds from the Series C offering "for general corporate and working capital purposes." As Shafi knew, or was reckless in not knowing, this statement was misleading because the PSPA failed to disclose that Shafi and Woortmann regularly used IRL's business credit cards to pay for their personal expenses, and used IRL's funds to pay the monthly credit card bills. As Shafi knew, or was reckless in not knowing, this statement was also misleading because the PSPA did not disclose that Shafi and Woortmann would continue charging personal expenses to IRL's business credit cards, and that they would use proceeds from the Series C offering to pay the monthly credit card bills.

39. In the PSPA, Shafi and IRL also represented that "none of [IRL's] directors, officers or employees, or any members of their immediate families . . . are, directly or indirectly,

indebted to [IRL]." As Shafi knew, or was reckless in not knowing, this statement was false and misleading because, by charging personal expenses to IRL business credit cards, Shafi and Woortmann were incurring at least hundreds of thousands of dollars in liability to IRL for misappropriating IRL's funds.

40. In the PSPA, Shafi and IRL also represented that there were "no agreements, understandings, or proposed transactions (in any case oral or written) between [IRL] and any of its officers" other than (i) "standard employee benefits generally made available to all employes . . .," (ii) "standard director and officer indemnification agreements approved by the Board of Directors," (iii) "inventions assignment agreements . . . ," and (iv) "the purchase of shares . . . and the issuance of options . . . in each instance, approved in the written minutes of the Board of Directors." As Shafi knew, or was reckless in not knowing, this statement was misleading because it did not disclose Shafi's practice of charging personal expenses to his IRL business credit card.

41. Neither Shafi nor IRL disclosed that Shafi and Woortmann had a longstanding practice of paying for personal expenses using IRL's business credit cards and had, by May 2021, already charged at least hundreds of thousands of dollars in personal expenses to those credit cards.

42. Had they known about it, IRL's investors would have considered information about Shafi's use of an IRL business credit card to pay for personal expenses to be important to their investment decisions because such use called into question Shafi's judgment as a CEO. When a Special Committee of IRL's Board of Directors, which included representatives from VC1 and VC2, eventually learned that Shafi and Woortmann had been using their IRL business credit cards to pay for personal expenses, the committee removed Shafi as IRL's CEO.

43. Pursuant to the May 18, 2021 PSPA, VC1 purchased about $125 million of IRL preferred stock directly from IRL, and VC2 purchased about $10 million of IRL preferred stock from IRL. In total, IRL sold about $145 million of preferred stock to investors in connection with the Series C offering, which had closing dates on May 18, 2021, June 1, 2021, June 14, 2021, and June 17, 2021.

44. At the same time, VC1 also purchased about $25 million of IRL securities from existing IRL employees, including about $7.5 million directly from Shafi.

45. After the Series C offering closed, Shafi unilaterally raised his own salary from about $400,000 to about $1 million per year. He did not inform IRL investors or IRL's Board of Directors about this raise until more than a year later, in October 2022.

E. **After the 2021 Securities Offering, Shafi Continued To Conceal From Investors IRL's Reliance On Incent Advertising By Directing A Scheme To Falsify The Company's Financial Statements.**

46. On May 19, 2021, Shafi hired Individual 2 as IRL's "Director of Growth." In this role, Individual 2 was responsible for managing IRL's paid media and growing IRL's user base. Individual 2 also continued to manage the Agency, and the Agency continued to pay IRL's invoices from the Incent Ad Platform. Over time, the Agency came to manage and pay some of IRL's other marketing and advertising vendors as well.

47. In August 2021, IRL hired its first Chief Financial Officer ("CFO"). In order to better track IRL's expenses and to prepare quarterly financial reports for IRL's Board of Directors (which included representatives from VC1 and VC2), IRL's CFO asked Individual 2 to create monthly invoices describing the services that the Agency was providing to IRL. IRL's CFO asked Individual 2 to create invoices both on a going-forward basis and for the work that the Agency had done for IRL in the past.

48. Shafi directed Individual 2 to create invoices that did not accurately reflect the work that the Agency had performed, and was continuing to perform, for IRL. Specifically, Shafi directed that on each of the Agency's monthly invoices, the Agency should allocate 90% of its charges to a line item titled "Infra Cost," regardless of the true nature of the Agency's work for IRL or expenditures on behalf of IRL. Shafi directed that only a small portion of each invoice be allocated to a line item called "Growth Cost." Shafi further directed that the invoices should state, "Infra cost relates to Amazon Web Services, SMS, Google Cloud costs." Individual 2 prepared Agency invoices pursuant to Shafi's directions and provided those invoices to IRL's CFO.

49. As Shafi knew, or was reckless in not knowing, these invoices were false and misleading. Most of the money that IRL paid the Agency each month—both before and after the Series C offering—was used to pay IRL's marketing and advertising vendors, including the Incent

Ad Platform. Relatively little of the money that the Agency paid on IRL's behalf went to actual infrastructure providers like Amazon Web Services or Google Cloud, or to SMS messaging services.

50. IRL's financial employees and contractors relied on the Agency's invoices in preparing quarterly financial reports for IRL's Board of Directors. Because the Agency's invoices falsely allocated the majority of the Agency's charges to "Infra Cost," those financial reports significantly overstated the amount of money IRL was spending on infrastructure expenses and significantly understated the amount of money IRL was spending on marketing and advertising expenses.

51. For example, the financial reports prepared for the Board of Directors showed that, in 2021, IRL had about $4.2 million in "growth" expenses and about $13.5 million in infrastructure expenses. IRL's true 2021 expenses were the reverse of this: more than $14.2 million in growth expenses, and only about $3.4 million in infrastructure expenses.

### F.  After the Series C Offering, Shafi and Woortmann Continued To Use IRL's Business Credit Cards To Pay For Personal Expenses.

52. After the Series C offering closed, Shafi and Woortmann continued to use IRL's business credit cards to pay for millions of dollars in additional personal expenses, including clothing and jewelry expenses, travel expenses, everyday living expenses, and home improvement and home furnishing expenses. Among other things, Shafi and Woortmann used the IRL credit cards to pay for hundreds of thousands of dollars in airfare and luxury hotel expenses for guests at their April 2022 wedding.

53. In late 2021, IRL's CFO discovered that Shafi and Woortmann had been charging what appeared to be personal expenses to IRL's business credit cards. After the CFO confronted Shafi about these expenses, Shafi admitted that he and Woortmann had been charging personal expenses to their IRL credit cards. Shafi also agreed to pay back the expenses that he admitted were personal in nature.

54. But Shafi maintained that some of the expenses the CFO asked about were genuine business expenses. The CFO asked Shafi to provide receipts documenting these purported business expenses, but Shafi provided the CFO with relatively few such receipts.

55. After Shafi admitted to the CFO that he and Woortmann had been charging personal expenses to their IRL business credit cards, the couple continued to charge additional personal expenses to those credit cards. Shafi never did anything to memorialize contemporaneously which expenses on his IRL business credit card were business expenses and which ones were personal expenses.

56. Between December 2021 and January 2023, Shafi reimbursed IRL for about $2.5 million of his and Woortmann's personal expenses. But Shafi did not reimburse IRL for other expenses that, based on available credit card and digital payment platform records, appear to be personal in nature. Examples of charges that appear to be personal in nature and not yet reimbursed include the following:

   a. Two June 21, 2021 charges on Woortmann's IRL credit card, of $12,074.92 and $4,100.90, at a merchant that appears to provide goods and services related to spirituality and alternative medicine;

   b. An October 3, 2021 charge on Shafi's IRL credit card of $34,714.75, identified on the credit card statement as a luxury resort hotel on the island of Hawaii;

   c. A December 23, 2021 charge on Woortmann's IRL credit card of $21,712.25, identified on the credit card statement as a luxury resort hotel on the island of Hawaii; and

   d. A May 15, 2022 charge on Shafi's IRL credit card of $4,367.88, identified on the credit card statement as a luxury resort hotel on the island of Lanai.

**G.  A Special Committee of IRL's Board of Directors Removed Shafi As CEO And Determined That a Substantial Percentage Of IRL's Users Were Likely Bots.**

57. IRL's Board of Directors did not learn about Shafi and Woortmann's use of IRL credit cards for personal expenses until April 2023. At that point, a Special Committee of IRL's Board of Directors removed Shafi as IRL's CEO.

58. Shortly after the Special Committee removed Shafi from the CEO role, IRL's purported number of users plummeted. A forensic analysis undertaken at the direction of the Special Committee determined that, prior to the collapse, a substantial percentage of IRL's users were likely bots. More specifically, the analysis determined that 95% of users for which detailed usage data were available were likely bots, and that the accounts for which such data were not available were also unlikely to be representative of human activity.

**FIRST CLAIM FOR RELIEF (Shafi Only)**

*Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder*

59. The SEC re-alleges and incorporates by reference Paragraph Nos. 1 through 58.

60. Shafi, by engaging in the conduct described above, directly or indirectly, in connection with the purchase or sale of securities, by use of means or instrumentalities of interstate commerce, or of the mails, with scienter:

   a. Employed devices, schemes, or artifices to defraud;
   b. Made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and
   c. Engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons, including purchasers of securities.

61. By reason of the foregoing, Shafi violated, and unless restrained and enjoined will continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

**SECOND CLAIM FOR RELIEF (Shafi Only)**

*Violations of Section 17(a) of the Securities Act*

62. The SEC re-alleges and incorporates by reference Paragraph Nos. 1 through 58.

63. Shafi, by engaging in the conduct described above, directly or indirectly, in the offer or sale of securities, by use of the means or instruments of transportation or communication in interstate commerce or by use of the mails:

a. with scienter, employed devices, schemes, or artifices to defraud;

b. obtained money or property by means of untrue statements of material fact or by omitting to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and

c. engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon purchasers.

64. By reason of the foregoing, Shafi violated, and unless restrained and enjoined will continue to violate, Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

**THIRD CLAIM FOR RELIEF (Woortmann Only)**

*Relief Defendant – Unjust Enrichment*

65. The SEC re-alleges and incorporates by reference Paragraphs 1 through 58.

66. Woortmann, through her use of an IRL business credit card to pay for personal expenses, has been unjustly enriched under circumstances in which it is not just, equitable, or conscionable for her to retain such funds.

**PRAYER FOR RELIEF**

WHEREFORE, the SEC respectfully requests that the Court:

**I.**

Permanently enjoin Shafi from violating, directly or indirectly, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5] thereunder, and Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

**II.**

Permanently enjoin Shafi from directly or indirectly, including, but not limited to, through any entity owned or controlled by him, participating in the issuance, purchase, offer, or sale of any securities, provided however, that such injunction shall not prevent Shafi from purchasing or selling securities for his own personal accounts.

**III.**

Permanently bar Shafi from serving as an officer or director of any issuer having a class of securities registered with the SEC pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78l] or that is required to file reports pursuant to Section 15(d) of the Exchange Act [15 U.S.C. § 78o(d)], pursuant to Section 20(e) of the Securities Act [15 U.S.C. § 77t(e)] and Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)].

**IV.**

Order Shafi to disgorge all ill-gotten gains received as a result of his unlawful conduct plus prejudgment interest thereon pursuant to Sections 21(d)(3), 21(d)(5), and 21(d)(7) of the Exchange Act [15 U.S.C. §§ 78u(d)(3), 78u(d)(5), and 78u(d)(7)].

**V.**

Order Shafi to pay a civil monetary penalty pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)], and Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)].

**VI.**

Order Woortmann to disgorge the ill-gotten gains or unjust enrichment she obtained or derived from Shafi's unlawful conduct, together with prejudgment interest on all such amounts.

**VII.**

Retain jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered, or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court.

# VIII.

Grant such other and further relief as this Court may determine to be just, equitable, and necessary.

Dated: July 31, 2024                    Respectfully submitted,

 */s/ Matthew Meyerhofer*
Matthew Meyerhofer
Attorney for Plaintiff
SECURITIES AND EXCHANGE COMMISSION