**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION**, <br><br> Plaintiff, <br><br> v. <br><br> **ABRAHAM SHAFI, ET AL.**, <br><br> Defendants. | Case No.  24-cv-04636-YGR <br><br> **ORDER DENYING MOTIONS TO DISMISS** <br><br> Re: Dkt. Nos. 20, 23, 35, 45, & 46. |

Plaintiff Securities and Exchange Commission (the "SEC") alleges that defendant Abraham Shafi engaged in a fraudulent scheme to mislead investors and sell $170 million of preferred stock in Get Together, Inc. ("IRL"), a social media platform that Shafi co-founded and then led as its Chief Executive Officer ("CEO"), during IRL's "Series C" private offering. The SEC brings suit against Shafi for violations of Section 10(b) and Rule 10b-5 of the Securities Exchange Act of 1934 and Section 17(a) of the Securities Act of 1933, and against Shafi's wife, Barbara Woortmann, as a relief defendant for unjust enrichment. Shafi and Woortmann move to dismiss the complaint for failure to state a claim.  (Dkt. Nos. 20, 23.)[1]

In summary, the SEC contends that Shafi touted IRL's organic growth while both misleadingly omitting and affirmatively misstating the role that paid incentive-based advertising played in IRL's popularity. The SEC further alleges that Shafi and Woortmann charged millions of dollars in personal expenses to IRL company credit cards before and after the Series C offering despite representing to investors that the Series C funds would be used solely for corporate

---

[1] Upon reassignment to this Court, defendants re-noticed their motions to dismiss at Dkt. Nos. 45 & 46.

purposes.

The SEC has sufficiently alleged each of the theories outlined above. Additionally, the SEC has adequately stated a claim against Woortmann as a relief defendant who received ill-gotten funds through the credit card purchases and did not have a legitimate claim to those funds.[2] As such, the motions to dismiss are **DENIED**.

I.  **BACKGROUND**

The SEC's complaint is grounded in many of the same facts as the complaint brought by private investors in IRL, which the Court recently ruled to be largely well-pled. (*See* Case No. 4:23-cv-3834-YGR, Dkt. No. 97.) The SEC's complaint alleges as follows:

"In September 2019, Shafi began using 'incent' advertising to promote IRL." (Dkt. No. 1, Complaint ("Comp."), ¶ 20.)[3] To effectuate this scheme, Shafi relied on "Individual 1." Specifically, the platform which handled the incent advertising services would send Individual 1 an invoice. Individual 1 would ask Shafi for the funds to pay the invoice and IRL would send the necessary funds to "an entity controlled by Individual 1." (*Id*. ¶ 22.) In October 2022, another individual referred to as "Individual 2" assumed the role of the intermediary in this scheme and used an entity they controlled which the SEC labels the "Agency." (*Id*. ¶ 23.)

From January 2019 through September 2022, Shafi spent millions on personal expenses for him and Woortmann using company credit cards. (*Id*. ¶ 25.) "These expenses included: purchases from home improvement and home furnishing retailers; purchases from clothing and jewelry retailers; airfare; stays at luxury hotels in Hawaii and elsewhere; everyday expenses from restaurants, grocery stores, food delivery apps, and rideshare apps; and PayPal and Venmo

---

[2] Pursuant to Federal Rule of Civil Procedure 78(b) and Civil Local Rule 7-1(b), the Court finds this motion appropriate for decision without oral argument.

[3] Incent advertising is a strategy which included, as alleged here, encouraging users of a mobile app game to download IRL's app in exchange for in-game currency. This can drive a high number of downloads for a relatively low cost. However, the total download number can be misleading because "users who download an app via an incent ad are incentivized by a reward unrelated to the app, [and are therefore] less likely to turn into long-term users." (Comp. ¶ 19.)

2

payments that appear to be of a personal nature, including payments to Woortmann's family and friends." (*Id.*)

Shafi made numerous misrepresentations directly to investors from March through June 2021 while soliciting investments for IRL:

- "Shafi presented IRL as an app that had achieved impressive growth organically—meaning from users who did not sign up via a paid advertisement—and . . . omitted any reference to incent ads from the materials he shared with investors." (*Id.* ¶ 28.) This included providing "prospective investors with a 'Spend Summary' that purported to break down IRL's operating expenses into several categories on a month-by-month basis." (*Id.* ¶ 29.) The summary intimated "that IRL's total PR/marketing expenses averaged out to less than $40,000 per month," when in reality "from January 2020 to February 2021, IRL spent, on average, more than $200,000 per month on the Incent Ad Platform alone," with the figure growing to $500,000 a month in March and April 2021. (*Id.*)

- "During a March 16, 2021 text message conversation between Shafi and the Managing Partner of [a venture capital firm referred to as] VC2, Shafi sent the Managing Partner text messages with excerpts from the 'Spend Summary.' The Managing Partner remarked that another prospective investor would 'love' that IRL 'spent virtually zero on marketing.' Shafi misleadingly replied, 'That's us! Real social.'" (*Id.* ¶ 30.)

- "On April 19, 2021, Shafi sent [another such firm referred to as] VC1 a question-and-answer ('Q&A') document claiming that IRL spent about $50,000 per month on advertising. The same document misleadingly attributed IRL's high rank in the Apple App Store to 'organic channels,' without mentioning IRL's use of incent advertisements." (*Id.* ¶ 31.)

- Slide decks and emails sent or presented to potential investors mentioned only IRL's supposedly organic growth without mention of incent advertising. (*Id.* ¶¶ 33-34.)

- Shafi told a potential investor that "IRL had received multiple term sheets from other prospective investors valuing IRL at $1 billion," despite IRL having "received only one tentative term sheet from a prospective investor, [who] had withdrawn the term sheet a month earlier, on March 23, just one day after sending it." (*Id*. ¶ 36.)

- In a Preferred Stock Purchase Agreement signed in May 2021, Shafi promised to use the funds raised thereby for corporate purposes and stated that no IRL officer or director (or any of their family members) were indebted to IRL. This was false, as the funds were continuously used for personal expenses, and by then, Shafi and Woortmann were indebted to IRL for the personal expenses previously charged. (*Id*. ¶¶ 37-39.) The agreement further falsely stated there were "no agreements, understandings, or proposed transactions (in any case oral or written) between [IRL] and any of its officers" outside (i) "standard employee benefits generally made available to all employes . . . ," (ii) "standard director and officer indemnification agreements approved by the Board of Directors," (iii) "inventions assignment agreements . . . ," and (iv) "the purchase of shares . . . and the issuance of options . . . in each instance, approved in the written minutes of the Board of Directors." (*Id*. ¶ 40.)

Beyond direct communications, certain other efforts were made to mislead investors. For example, upon hiring Individual 2 as IRL's Director of Growth, Shafi instructed Individual 2 to create monthly invoices describing the Agency's work for IRL. Rather than reflecting the payment for incent advertising, Shafi ordered "that on each of the Agency's monthly invoices, the Agency should allocate 90% of its charges to a line item titled 'Infra[structure] Cost' . . . . Shafi directed that only a small portion of each invoice be allocated to a line item called 'Growth Cost.'" (*Id*. ¶ 48.) The complaint notes that these invoices formed the basis for quarterly financials prepared for the Board of Directors, and thus Shafi's instructions caused those financial reports to be false or misleading. In addition to alleging that Shafi knew the real truth behind IRL's advertising spend and user growth by virtue of his position, the complaint supports scienter by alleging Shafi sent a

text message to a representative of the incent advertising platform that said: "I spend millions with you. I expect some basic treatment." (*Id*. ¶ 32.)

Pursuant to the agreement referenced above, IRL sold $135 million of preferred stock to venture capital funds, selling $145 million total in preferred stock as part of its Series C offering in May and June 2021. (*Id*. ¶ 43.) During this time, one such fund purchased $25 million in IRL securities directly from IRL employees, including $7.5 million from Shafi himself. (*Id*. ¶ 44.)

The Board of Directors eventually learned of the personal expenses for which IRL was paying, and confronted Shafi, who initially promised to reimburse IRL. (*Id*. ¶ 53.) "Between December 2021 and January 2023, Shafi reimbursed IRL for about $2.5 million of his and Woortmann's personal expenses. But Shafi did not reimburse IRL for other expenses that, based on available credit card and digital payment platform records, appear to be personal in nature."[4] (*Id*. ¶ 56.)

Ultimately, a special committee of IRL directors, which included representatives from two venture capital funds, removed Shafi as CEO upon learning of the personal expenses being charged to corporate cards. (*Id*. ¶ 42.) Shortly thereafter, a forensic report commissioned by the committee found that 95% of IRL's users "for which detailed usage data were available" had been bots. (*Id*. ¶ 58.) IRL's user bases plummeted soon after Shafi's ouster. (*Id*.)

## II.   LEGAL STANDARD

To support a claim under Section 17(a)(2) of the Securities Act of 1933 and Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5(b), the SEC must allege (1) a materially false or misleading statement (2) made with scienter (3) in connection with the offer or sale of a security (4) by means of interstate commerce. *See SEC v. Dain Rauscher*, *Inc.*, 254 F.3d 852, 855-56 (9th Cir. 2001). To support a claim for scheme liability under Sections 17(a)(1) and (3), and Section 10(b) and Rule 10b-5(a) and (c), a plaintiff must adequately plead that, in connection with a securities transaction, a "defendant's conduct or role in an illegitimate transaction has the principal purpose and effect of creating a false appearance of fact in the furtherance of a scheme to defraud."

---

[4] As examples of these personal expenses for which IRL never received reimbursement, the complaint lists charges for "spirituality and alternative medicine" and luxury resorts in Hawaii. (Comp. ¶ 56.)

*SEC v. Daifotis*, 2011 WL 2183314 at *9 (N.D. Cal. June 6, 2011) (quoting *Simpson v. AOL Time Warner Inc.*, 452 F.3d 1040, 1050 (9th Cir. 2006)).

Claims under these antifraud provisions are also subject to the heightened pleading requirements of Federal Rule of Civil Procedure 9(b), which requires falsity to be pled with "particularity." The plaintiff must allege the "who, what, when, where, and how" of the alleged misstatements "that would suggest fraud." *Cooper v. Pickett*, 137 F.3d 616, 627 (9th Cir. 1997) (internal cites omitted). Each allegedly false misrepresentation or omission must be considered individually to determine if dismissal is appropriate. *In re Robinhood Ord. Flow Litig.*, 2022 WL 9765563, at *6 (N.D. Cal. Oct. 13, 2022). While "a party must state with particularity the circumstances constituting fraud or mistake," "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b). Finally, unlike a Section 10(b) or Rule 10b-5 claim brought by a private investor, the SEC need not allege loss causation, economic loss, or reliance on the alleged misrepresentations or omissions. *See Gebhart v. SEC*, 595 F.3d 1034, 1038 n.8 (9th Cir. 2010); *SEC v. Rana Research, Inc.*, 8 F.3d 1358, 1364 (9th Cir. 1993).

### III.    ANALYSIS

#### A.    Liability as to Incent Advertising[5]

##### 1.    Actionable Misstatements or Omissions

Shafi first challenges the existence of any actionable misstatement or omission. "To be actionable under the securities laws, an omission must . . . affirmatively create an impression of a state of affairs that differs in a material way from the one that actually exists." *Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002)). Plaintiff, "in addition to alleging the 'time, place[,] and nature of the alleged fraudulent activities,' must 'plead evidentiary facts' sufficient to establish any allegedly false statement 'was untrue or misleading when made.'" *Wozniak v. Align Tech., Inc.*, 850 F.Supp.2d 1029, 1034 (N.D. Cal. 2012) (quoting *Fecht v. Price Co.*, 70 F.3d 1078, 1082 (9th Cir. 1995)).

---

[5] The complaint brings claims under Section 17(a)(2) of the Securities Act of 1933, and Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5(b). The pleading standards are similar. *See S.E.C. v. Fraser*, 2010 WL 5776401 at *4 and n.3 (D. Ariz. 2010) ("[T]e legal standard for imposing liability under Section 17(a) is similar to that of Section 10(b).")

6

1  The Court begins with analyzing the sufficiency of the SEC's alleged actionable affirmative
2  misstatements, and then the alleged actionable omissions.

### i. Affirmative Misstatements

The complaint alleges that, while raising funds in March to June 2021, Shafi shared a document with prospective investors showing total PR/marketing expenses averaging less than $40,000 per month from January 2020 to February 2021 (Comp. ¶¶ 29-30), when in fact Shafi was aware that IRL spent more than $200,000 per month on incentive-based advertising alone through February 2021 and increased its spend on such advertising in March and April 2021 to about $500,000 per month. (*Id.* ¶ 29.) It also alleges that Shafi underreported advertising spend in a due diligence questionnaire (referred to as a "Q&A document" in the complaint) exchanged with an investor in April 2021, which represented that IRL only spent about $50,000 per month on advertising. (*Id.* ¶ 31.)

In addition, the SEC alleges that Shafi instructed IRL's Director of Growth to prepare invoices allocating 90% of its spending with a business entity to "Infra[structure] Costs" rather than "Growth Cost," even though most of the money IRL paid to that entity was for marketing and advertising, not infrastructure providers. (*Id.* ¶¶ 48-49.) Further, because the Chief Financial Officer ("CFO") and others allegedly relied on those invoices to prepare quarterly financial reports for the Board of Directors, those reports overstated IRL's infrastructure expenses and understated its marketing and advertising expenses. (*Id.* ¶ 50.) While this conduct post-dated the securities transaction at issue, the Court may still consider these activities in its analysis because they are "relevant to the question of intent." *See, e.g.*, *SEC v. Holschuh*, 694 F.2d 130, 144 n.24 (7th Cir. 1982) ("A scheme to defraud may well include later efforts to avoid detection of the fraud.") (internal cites omitted).

Thus, the SEC has pleaded with the requisite specificity the existence of affirmative misstatements, each of which "affirmatively create[d] an impression of a state of affairs that differ[ed] in a material way from the one that actually exist[ed]" at the time they were made. *Brody*, 280 F.3d at 1006.

ii.     Omissions

As to omissions, the SEC identifies the following statements as misleading: (i) an April 2021 Q&A document claiming that IRL was highly ranked in the App Store because of its "organic channels" (Comp. ¶¶ 2, 31); (ii) an April 2021 statement that a surge in downloads in 2019 was due to "seasonality around the holidays" (*id.* ¶ 34); and (iii) a March 2021 text exchange in which the managing partner of an investor said that another prospective investor would "love" that IRL "spent virtually zero on marketing," and Shafi replied, "That's us! Real social" (*id.* ¶ 30).

Shafi contends that the SEC's failure to rule out the possibility that IRL did in fact experience significant organic (or seasonal) growth dooms its claims. The Court does not agree. While it is true that such allegations would strengthen the SEC's claims, they are not necessary here. The SEC has pled enough facts to support an inference that a significant amount of IRL's growth was due to incent ads. (*See id*. ¶ 21 (alleging that IRL spent around $5.7 million dollars on incent advertising between September 2019 and April 2021); *id.* ¶ 20 (alleging that Shafi informed incent advertisers that his "goal was to drive large download volumes and thereby achieve a high rank in the Apple App Store.").) Even if it were true that organic growth also contributed to IRL's success, Shafi's failure to disclose the substantial role of incent advertising still "create[s] an impression of a state of affairs that differs in a material way from the one that actually exists." *Brody*, 280 F.3d at 1006.

Shafi's authorities do not persuade otherwise. In *Inchen Huang v. Higgins*, the plaintiffs alleged that the defendants' announcement of strong sales numbers was materially misleading because it omitted the fact that defendants had engaged in off-label marketing during that time period. 2019 WL 1245136 (N.D. Cal. Mar. 18, 2019). In finding the omissions to be inactionable, the court reasoned that the plaintiffs' allegations "support an inference only that some limited amount of off-label marketing occurred" and that this "failure to plead a widespread off-label marketing campaign dooms their omission claim." *Id*. at *9. By contrast, here, the SEC has sufficiently alleged just such a widespread incent ad campaign in which IRL is alleged to have spent between $15,000 and $17,000 on incent ads *per day*. (Comp. ¶ 32.) *Kauffman v. Nat. Health Trends Corp*. is similarly inapposite. *See* 2019 WL 7165921, at *8 (C.D. Cal. Dec. 20, 2019).

1   There, the court found that the defendant's failure to disclose that the company's financial success
2   was "attributable, at least in part, to the [c]ompany's illegal pyramid marketing scheme" did not
3   create an actionable omission because the plaintiff failed to allege how the scheme "contributed
4   materially to the [c]ompany's success." *Id*. at 8.  By contrast, in this case, the SEC has explicitly
5   alleged that incent ads played a "significant role" in IRL's growth strategy which is plausible given
6   the allegations of the spending figures noted above.

7   The Court finds the SEC has adequately pled the existence of actionable omissions.

### 2. Materiality

9   Next, Shafi contends that the SEC fails to sufficiently allege the materiality of IRL's
10  monthly advertising costs and thus fails to state a claim.  Materiality exists "if there is a substantial
11  likelihood that a reasonable investor would have acted differently if the misrepresentation had not
12  been made or the truth had been disclosed." *Livid Holdings Ltd. v. Salomon Smith Barney, Inc.*,
13  416 F.3d 940, 946 (9th Cir. 2005). Moreover, although conclusory allegations are insufficient in a
14  complaint, "determining materiality in securities fraud cases should ordinarily be left to the trier of
15  fact." *In re Cutera Sec. Litig*., 610 F.3d 1103, 1108 (9th Cir. 2010).

16  Here, the complaint alleges that "[i]nvestors considered the amount of money IRL spent on
17  marketing and advertising to be important because, for example, the false lower figures presented
18  to investors by Shafi suggested that the app was growing efficiently and could eventually become
19  profitable." (Comp. ¶ 35.)  That is sufficient, particularly where the actual amount spent on
20  advertising was allegedly more than ten times what was represented.  That Shafi allegedly resorted
21  to having the advertising spending misidentified on invoices as "Infra[structure] Cost," which kept
22  the investors in the dark about the advertising spending, further supports an inference of the
23  materiality.  Although Shafi asserts that customer acquisition cost ("CAC") is a *more* probative
24  metric of efficient growth, the fact "[t]hat a [metric] is less significant does not mean it is
25  immaterial." *See SEC v. Reyes*, 491 F. Supp. 2d 906, 910 (N.D. Cal. 2007).  Indeed, that an
26  investor remarked that another prospective investor "would 'love' that IRL 'spent virtually zero on
27  marketing'" further supports the inference that this figure is material.  (*See* Comp. ¶¶ 29, 30.)

28  Thus, the Court finds materiality adequately pled.

### 3. Scienter

Third, Shafi challenges scienter. Pleading the necessary scienter requires alleging an "intent to mislead investors or deliberate recklessness to an obvious danger of misleading investors." *Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*, 63 F.4th 747, 765 (9th Cir. 2023) (cleaned up). Deliberate recklessness "represents an extreme departure from the standards of ordinary care such that the defendant must have been aware of it." *SEC v. Rubera*, 350 F.3d 1084, 1094 (9th Cir. 2003). "[R]ecklessness only satisfies scienter under § 10(b) to the extent that it reflects some degree of intentional or conscious misconduct." *SEC v. Platforms Wireless Int'l Corp.*, 559 F. Supp. 2d 1091, 1096 (S.D. Cal. 2008) (quoting *In re Silicon Graphics, Inc. Sec. Litig.*, 183 F.3d 970, 977 (9th Cir. 1999)).

The complaint alleges that Shafi caused IRL to pay its incent advertising platform "through third parties, in an apparent effort to conceal the true nature of those payments." (Comp. ¶ 3.) It also alleges that in April 2021 Shafi knew that IRL's spending on incent advertisements had increased to between $15,000 and $17,000 per day, and that in December 2020 Shafi complained to a customer service representative of the ad platform that he "spend[s] millions with you." (Comp. ¶ 32.) These allegations adequately demonstrate that Shafi knew or was reckless in not knowing that the true advertising expenditures were much higher than he represented to investors.

Such conduct, when "presum[ing] all factual allegations of the complaint to be true and [] draw[ing] all reasonable inferences in favor of the nonmoving party," is sufficient to demonstrate that Shafi intended to mislead investors about IRL's incent ad spend. *See SEC v. Sabhlock*, 2009 WL 10690310 at *2 (N.D. Cal. 2009). Shafi contends that because third parties might commonly be used in these types of transactions, Shafi's actions fail to adequately allege scienter. Shafi, however, cites no authority requiring the SEC to rule out every possible explanation for this payment structure in order to state a claim. Indeed, scienter need only be alleged generally. Fed. R. Civ. P. 9(b). Furthermore, the complaint identifies post-Series C conduct that supports an inference of Shafi's intent to mislead investors about this topic prior to the transaction. As noted above, the SEC alleges that Shafi directed that invoices for incent ads be relabeled as being for "Infra[structure] Cost," which caused IRL's quarterly financial reports to understate advertising

expenses, resulting in investors being kept in the dark about significant sums being spent on advertising generally and incent ads in particular. (*See* Comp. ¶ 48.) At the motion to dismiss stage, this is sufficient.

Plaintiff successfully alleges liability based on the incent advertising allegations.

### B. Liability as to the Preferred Stock Purchase Agreement ("PSPA") and Scheme Liability

The SEC also alleges liability based on Shafi's repeated charging of personal expenses to the IRL company card. Specifically, the complaint alleges this activity rendered the PSPA, an agreement that Shafi signed on behalf of IRL, false and/or misleading. The SEC relies on three specific PSPA provisions: (1) the "Use of Proceeds Clause," which provided that "IRL would use proceeds from the Series C offering 'for general and corporate working capital purposes'" (Comp. ¶ 38); the "Debt Clause," which provided that "none of [IRL's] directors, officers or employees, or any members of their immediate families . . . are, directly or indirectly, indebted to [IRL]" (*id.* ¶ 39); and the "Other Agreements Clause," which provided, in relevant part, that there were "no agreements, understandings, or proposed transactions (in any case oral or written) between [IRL] and any of its officers" other than "standard employee benefits generally made available to all employees . . . " (*id.* 40).

As above, Shafi challenges the existence of any actionable misleading statement or omission, materiality, and scienter. Shafi further claims the complaint fails to adequately allege scheme liability.

#### 1. Actionable Misstatements or Omissions

According to the complaint, Shafi charged hundreds of thousands of dollars in personal expenses to the IRL card prior to the Series C offering, eventually paying back $150,000 from his own funds to the card balance before the closing. (*Id.* ¶¶ 4, 26, 39, 41.) Shafi allegedly continued to use the IRL cards for personal expenses after the Series C closed. (*Id.* ¶ 52.) While Shafi ultimately reimbursed IRL for approximately $2.5 million of his and Woortmann's personal expenses, it is also alleged that Shafi "did not reimburse IRL for other expenses that, based on available credit card and digital payment platform records, appear to be personal in nature." (*Id.*

11

¶ 56.) These additional expenses include two charges for alternative medicine-related goods or services totaling $16,176 and three charges to luxury hotels in Hawaii totaling $60,795. (*Id.*)

*Use of Proceeds Clause.* From these allegations, it is plausible that the Use of Proceeds Clause was misleading because portions of the Series C proceeds were not used "for general and corporate working capital purposes," but rather for Shafi and Woortmann's personal use. At the very least, the alleged alternative medicine and luxury hotel charges appear to be personal expenses that were never reimbursed to IRL. Even in the unlikely event that these charges turn out to be legitimate, that Shafi charged personal expenses to the company in the first place —regardless of whether those expenses were ultimately reimbursed—is sufficient to allege a violation of the Use of Proceeds Clause. *See SEC v. Reyes*, 491 F. Supp. 2d 906, 909-910 (N.D. Cal. 2007) ("Simply put, a defendant is not absolved of liability by remitting his loot. . . . [T]his argument is akin to getting caught with a cookie in hand, putting it back in the jar, and speaking of the theft as only a 'hypothetical snack.'").

*Debt Clause.* The SEC has also plausibly alleged that the Debt Clause was misleading due to the significant amounts of liability Shafi and Woortmann incurred both before and after the Series C. Shafi argues that this claim fails because the SEC does not allege that Shafi owed IRL money at the time of the Series C, since he allegedly reimbursed $150,000 to IRL before the round. Even without this specific allegation, the SEC has adequately pled that the Debt Clause created a misleading impression of the actual situation, which involved the CEO repeatedly incurring hundreds of thousands of dollars in liability to his company through use of the company credit card.

*Other Agreements Clause.* The complaint adequately pleads that the "Other Agreements Clause" was misleading. As alleged, contrary to the clause, there was an "understanding" between IRL and Shafi, which was not extended to any other employees, that Shafi could charge personal expenses to IRL and selectively pay the money back. This "agreement" was allegedly in place before the Series C and continued after funding was acquired.

Thus, the Court finds the complaint adequately alleges the existence of actionable misstatements or omissions with regard to the use of the corporate credit card.

### 2. Materiality

With respect to materiality, the complaint alleges that investors consider a CEO's personal use of company funds to be important "because such use call[s] into question [one's] judgment as CEO." (Comp. ¶ 42.) Indeed, when IRL's Board of Directors—which included representatives from IRL's Series C investors—eventually learned of Shafi's personal use of funds in April 2023, they removed him as CEO. (*Id.* ¶¶ 42, 57.) While the removal occurred after the Series C closing, it is probative evidence that an investor might have changed their mind about investing in IRL had they known of Shafi's conduct. Shafi also argues that the quantity of money allegedly charged to IRL by Shafi and Woortmann is insignificant in light of the $145 million Series C investment.

The Court disagrees for at least two reasons: first, the complaint alleges that Shafi and Woortmann charged *millions* of dollars to IRL, and second, "[i]nvestors have a right to know – and would reasonably consider it important – when the head of a [] company is stealing *any* quantity of money from their company." *See SEC v. Pace*, 173 F. Supp. 2d 30, 33 (D.D.C. 2001) (emphasis added). The SEC has also sufficiently pled materiality.

### 3. Scienter

With respect to scienter, allegations need not be particularized. *SEC v. Leslie*, 2008 WL 3876169, at *6 (N.D. Cal. Aug. 19, 2008) (explaining that "plaintiffs may aver scienter generally, just as the rule states – that is, simply by saying that scienter existed") (internal cites omitted). Here, the complaint alleges that Shafi signed the PSPA and "knew or was reckless in not knowing" that his ongoing personal use of the IRL company card might cause the relevant clauses in the agreement to be false and misleading. (Comp. ¶¶ 37-41.)

Given the context of the whole, the SEC's allegations are sufficient for this element.

### 4. Scheme Liability

A defendant may be liable for a scheme to defraud if he "committed a manipulative or deceptive act in furtherance of a scheme." *Simpson*, 452 F.3d at 1048 (quoting *Cooper v. Pickett*, 137 F.3d 616, 624 (9th Cir. 1997)).

Here, the SEC alleges that Shafi used IRL's card for personal use without the IRL CFO's knowledge until late 2021. Even after he agreed with the CFO to pay back any personal charges

made, he allegedly "never did anything to memorialize contemporaneously which expenses on his IRL business credit card were business expenses and which ones were personal," (Comp. ¶ 55), which plausibly supports an inference of the requisite manipulative behavior. *See SEC v. Cap. Cove Bancorp*, LLC, 2015 WL 9704076, at *6 (C.D. Cal. Sept. 1, 2015) (misuse of investor funds for personal expenses evidenced scheme to defraud). These post Series C acts, moreover, are made "in connection with the offer or sale of a security" because they directly bear on the representations made in the PSPA and are part of the same pattern of conduct that preceded the transaction. *See SEC v. Dain Rauscher*, Inc., 254 F.3d 852, 855-56 (9th Cir. 2001).

Shafi proffers alternative, innocuous explanations for the credit card spend which may ultimately prove persuasive to a jury, including the fact that IRL's CFO was aware of the expenses and that no one at IRL asked Shafi to stop these spending habits. These alternatives do not detract from the plausibility of the SEC's allegations, which at this stage the Court finds to be sufficient. The complaint plausibly identifies deceptive acts Shafi committed in furtherance of a scheme.

\*\*\*

The complaint adequately sets forth plausible bases for liability against Shafi based on both the incent advertising and the credit card purchases. Therefore, the motion to dismiss the first and second claims is **DENIED.**

### C. Claim Against Woortmann

With respect to the claim against Woortmann, a relief defendant is someone "who is not accused of wrongdoing in a securities enforcement action [but]: (1) has received ill-gotten funds; and (2) does not have a legitimate claim to those funds." *SEC v. Crowd Mach., Inc.*, 2023 WL 8438553 at *6 (N.D. Cal. Dec. 5, 2023).

Here, the complaint alleges that Woortmann received ill-gotten funds by making personal purchases using IRL's credit card, which were allegedly paid off using IRL's bank account. (Comp. ¶¶ 4, 24-26, 38-42, 52-56.) Further, it pleads the second factor by alleging that Woortmann "was never an employee or contractor of IRL," (*Id.* ¶ 24), and that the allegedly unreimbursed credit card charges (spirituality and alternative medicine and luxury resorts) were plausibly personal in nature.

These allegations are sufficient to state a claim. The motion to dismiss is **DENIED.**

IV. **CONCLUSION**

For the reasons set forth above, the motions to dismiss the claims against both Shafi and Woortmann are **DENIED.** Answers to the complaint shall be filed within fourteen days of this order. A case management conference is hereby scheduled for **April 28, 2025 at 2:00 p.m.** on the Zoom platform.[6]

This terminates Docket Nos. 20, 23, 35, 45, & 46.

**IT IS SO ORDERED**.

Date: March 31, 2025

YVONNE GONZALEZ ROGERS
UNITED STATES DISTRICT COURT JUDGE

---

[6] At Dkt. No. 35, the parties filed a joint stipulation and proposed order as to the Court's scheduling of the next case management conference. Given the instruction to that effect herein, the proposed order is **DENIED AS MOOT.**

15